UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PRISCILLA ANITA GARCIA, | ) | No. EDCV 14-2107 AGR |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM OPINION AND ORDER |
| CAROLYN W. COLVIN,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Plaintiff Priscilla Anita Garcia filed this action on October 21, 2014.  Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge.  (Dkt. Nos. 10, 11.)  On June 1, 2015, the parties filed a Joint Stipulation ("JS") that addressed the disputed issues.  The court has taken the matter under submission without oral argument.

Having reviewed the entire file, the court affirms the decision of the Commissioner.

**I.**

**PROCEDURAL BACKGROUND**

Garcia filed an application for disability insurance benefits and alleged an onset date of June 6, 2003.  Administrative Record ("AR") 70.  The application was denied initially and on reconsideration.  AR 45-46.  Garcia requested a hearing before an Administrative Law Judge ("ALJ").  AR 69.  On February 14, 2007, the ALJ conducted a hearing at which Garcia and a vocational expert ("VE") testified.  AR 335-83. On May 25, 2007, the ALJ issued a decision denying benefits.  AR 47-56.  On December 14, 2007, the Appeals Council remanded the matter to the ALJ for further proceedings.  AR 23-28.

On May 6, 2008, the ALJ conducted a second hearing at which Garcia and a VE testified.  AR 384-410.  On June 26, 2008, the ALJ issued a decision denying benefits.  AR 8-16.  The Appeals Council denied review on June 9, 2010.  AR 3-5.  Garcia filed a civil action.  On March 21, 2011, the court approved the parties' stipulation for voluntary remand, and remanded the action to the Commissioner for further proceedings.  AR 541-42.  On June 1, 2011, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  AR 545-48.  Because Garcia had since been found disabled as of May 30, 2008, based on her application for supplemental security income benefits, the ALJ was limited to the period June 6, 2003 through December 31, 2004, the date last insured.  AR 545.

On September 16, 2011, the ALJ conducted a third hearing at which Garcia and a VE testified.  AR 752-73.  On December 23, 2011, the ALJ issued a decision denying benefits.  AR 411-22.  On April 16, 2012, Garcia filed a civil action.  On December 20, 2012, the court approved the parties' stipulation for voluntary remand, and remanded the action to the Commissioner for further proceedings.  AR 804-07.  On June 27, 2013, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  AR 808-12.  The Appeals Council instructed the ALJ to reevaluate

whether Garcia had any severe orthopedic or psychological conditions, including her allegations of impairment from carpal tunnel syndrome, depression, and fibromyalgia; evaluate evidence of obesity in the record consistent with Social Security Ruling ("SSR")[1] 02-01p; reassess Garcia's RFC by evaluating the treating and non-treating source opinions, including but not limited to the opinions of Drs. Hantz, Meltzer and Smith, explaining the reasons for the weight accorded to the opinions; discuss Garcia's purported need for an assistive device for ambulation, and any effect that may have on her RFC; reevaluate the credibility of Garcia's subjective complaints and the lay witness testimony of Garcia's husband; and if warranted, obtain supplemental VE testimony to clarify the effect of the assessed limitations on Garcia's occupational base.  AR 811-12.

On March 7, 2014, the ALJ conducted a fourth hearing at which Garcia and a VE testified.  AR 915-54.  On June 16, 2014, the ALJ issued a decision denying benefits.  AR 774-88.  The ALJ's unfavorable decision became the final decision of the Commissioner.  This action followed.

## II.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards.  *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  *Moncada*, 60 F.3d at 523.  In determining whether

---

[1]  Social Security rulings do not have the force of law.  Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

1  substantial evidence exists to support the Commissioner's decision, the court examines

2  the administrative record as a whole, considering adverse as well as supporting

3  evidence.  *Drouin*, 966 F.2d at 1257.  When the evidence is susceptible to more than

4  one rational interpretation, the court must defer to the Commissioner's decision.

5  *Moncada*, 60 F.3d at 523.

6                                             **III.**

7                                     **DISCUSSION**

8        **A.     Disability**

9        A person qualifies as disabled, and thereby eligible for such benefits, "only if his

10  physical or mental impairment or impairments are of such severity that he is not only

11  unable to do his previous work but cannot, considering his age, education, and work

12  experience, engage in any other kind of substantial gainful work which exists in the

13  national economy."  *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed.

14  2d 333 (2003) (citation and quotation marks omitted).

15       **B.     The ALJ's Findings**

16       The ALJ found that Garcia met the insured status requirements through

17  December 31, 2004.  AR 779.  Following the five-step sequential analysis applicable to

18  disability determinations, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006),[2]

19  the ALJ found that from June 6, 2003 through December 31, 2004, Garcia had the

20  severe impairments of arthritis; history of bilateral carpal tunnel syndrome, right greater

21  than left; fibromyalgia; mild osteoarthritis of bilateral knees; and depressive disorder.  *Id.*

22  Her impairments did not meet or equal a listing.  AR 780.  She had the residual

23  functional capacity ("RFC") to perform light work, except she could lift, carry, push or

24

25       [2]  The five-step sequential analysis examines whether the claimant engaged in

26  substantial gainful activity, whether the claimant's impairment is severe, whether the
    impairment meets or equals a listed impairment, whether the claimant is able to do his

27  or her past relevant work, and whether the claimant is able to do any other work.

28  *Lounsburry*, 468 F.3d at 1114.

pull 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours out of an eight-hour workday; and sit for about six hours.  She could frequently push/pull with the bilateral upper extremities.  She could occasionally perform postural activities such as climbing, balancing, stooping, kneeling, and crouching, but due to her knee impairment, she could not crawl.  She could use a cane for balance.  Due to carpal tunnel syndrome, she was limited to frequent bilateral handling, occasional fingering on the right, and frequent fingering on the left.  She should avoid concentrated exposure to vibration and hazards, such as moving machinery and working at heights.  She could understand, remember and carry out simple job instructions, but was unable to perform work that would require directing others, thinking in the abstract, or planning.  She could maintain concentration to perform simple, routine and repetitive tasks.  AR 782.  She was unable to perform any past relevant work, but there were jobs that existed in significant numbers in the national economy that she could have performed, such as counter clerk, booth cashier and order desk caller.  AR 787-88.

### C.   RFC Determination

Garcia contends that the ALJ's RFC assessment did not adequately account for her limitations from her fibromyalgia and carpal tunnel syndrome.

The RFC determination measures the claimant's capacity to engage in basic work activities. *Bowen v. New York*, 476 U.S. 467, 471, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986).  The RFC assessment is a determination of "the most [an individual] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a).  It is an administrative finding, not a medical opinion.  20 C.F.R. § 404.1527(e)(2).  The RFC takes into account both exertional limitations and non-exertional limitations.  The RFC must contain "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p.  The ALJ must also explain how he or she resolved material inconsistencies or ambiguities in the record.  *Id.*  "When there is

1   conflicting medical evidence, the Secretary must determine credibility and resolve the

2   conflict." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002) (citation omitted).

3         The ALJ properly considered Garcia's fibromyalgia.  The ALJ discussed both

4   pieces of evidence that Garcia argues that the ALJ failed to analyze:  a March 4, 2003

5   rheumatology consultation, and an October 14, 2004 letter from Dr. Hantz.  The ALJ

6   noted that prior to the alleged onset date, Garcia had 14 out of 18 tender points

7   associated with fibromyalgia during an examination on March 4, 2003.  AR 182, 783.

8   The ALJ also noted that during the March 2003 examination, Garcia had no synovitis

9   over the relevant joints of either hand and showed no clinical sign of rheumatoid

10  arthritis.  AR 182, 783.  Garcia was assessed with fibromyalgia and osteoarthritis of her

11  knees, and noted to be on appropriate medications.  AR 183.

12        The ALJ also cited the October 14, 2004 letter from Garcia's treating physician.

13  Dr. Hantz stated that Garcia suffered from fibromyalgia and carpal tunnel syndrome,

14  among other conditions.  AR 265, 783.  The ALJ found that Dr. Hantz failed to provide

15  any specific functional limitations as a result of Garcia's conditions.  AR 265, 783, 786.

16  Dr. Hantz' diagnoses were conclusory and not supported by the medical records that

17  documented limited physical findings.  AR 265, 786.

18        The ALJ found that the record documented limited physical findings with respect

19  to Garcia's fibromyalgia.  AR 786.  The record during the period of June 6, 2003 through

20  December 31, 2004, generally contains evaluations from consultative examiners and

21  State Agency medical consultants.  AR 783-86.  On August 10, 2004, an orthopedic

22  consultative examiner, Dr. Meltzer, conducted a physical examination that was

23  essentially normal.  AR 225-28, 784.  Dr. Meltzer diagnosed unsubstantiated joint

24  complaints, among other conditions.  AR 228, 784.  He concluded that Garcia had

25  issues that were non-orthopedic in nature and had no functional limitations.  AR 228-29,

26  784.  On September 2, 2004, a State Agency medical consultant, Dr. Manolakas,

27  assessed Garcia as capable of performing a range of light work, with postural activities

28

1   limited to occasional, no crawling and frequent gross manipulation.  AR 216-17, 785.

2   Garcia's history of fibromyalgia and carpal tunnel syndrome were taken into account in

3   the assessment.  AR 221.

4          Garcia's argument that the ALJ failed to properly evaluate her fibromyalgia as

5   required under SSR 12-2p fails.  SSR 12-2p designates two sets of diagnostic criteria

6   that can establish fibromyalgia as a medically determinable impairment.  SSR 12-2p,

7   2012 WL 3104869, at *2-3 (July 25, 2012).  The ALJ found that Garcia's fibromyalgia

8   was a medically determinable, severe impairment.  AR 779.  The ALJ properly

9   considered the longitudinal evidence regarding Garcia's fibromyalgia, found limited

10  treatment records and mild findings of fibromyalgia, and concluded that the RFC for a

11  range of light work with occasional postural activities accounted for Garcia's limitations

12  due to fibromyalgia.[3]  AR 782-84.

13         The ALJ properly considered Garcia's carpal tunnel syndrome.  Garcia argues

14  that she was limited to no more than occasional handling and fingering with both upper

15  extremities, rather than the RFC of frequent bilateral handling and occasional fingering

16  on the right and frequent fingering on the left.  The ALJ noted that an August 2003

17  electrodiagnostic study indicated increased motor and sensory latencies consistent with

18  bilateral carpal tunnel syndrome, right wrist greater than left.  AR 154, 783.  Garcia

19  testified that around the time of the conduction test, her doctor told her she probably did

20  not have carpal tunnel.  AR 357-58.  In November 2003, at an orthopedic consultation,

21  the doctor indicated that he thought Garcia would eventually need bilateral carpal tunnel

22  releases, starting with the right hand, but Garcia stated she did not want surgery

23  because her hands had gotten better since she stopped working in June 2003.  AR 165,

24  783.

25  _____

26     [3]  Garcia cites a fibromyalgia consult form, dated December 15, 2004, in support of
    her argument that she had "multiple positive signs and symptoms consistent with the
27  diagnosis of fibromyalgia."  JS 10; AR 284.  Although the form included positive findings
    of fatigue, sleep problems, and irritable bowel syndrome, the form noted "0" tender
28  points, and no current depression or anxiety.  AR 284.

1    In August 2004, Dr. Meltzer noted there was no clinical evidence of carpal tunnel

2    syndrome as all tests for the condition were negative bilaterally, including Finklestein's,

3    Allen's, Adson's maneuver and compression test of the median nerve.  AR 227, 785.

4    Dr. Meltzer diagnosed a history of carpal tunnel syndrome, unsubstantiated clinically,

5    and concluded Garcia had no functional limitations.  AR 227-29, 784-85.  In September

6    2004, Dr. Manolakas stated:  "ncs was positive for cts [carpal tunnel syndrome] but a

7    very thorough clinical exam was negative and cts is a clinical and not a lab diagnosis --

8    one can propose a median neuropathy at the wrist consistent with cts, however, this

9    was an old study with no published standards such as distances, temperature, and

10   normal values or technique."  AR 221.  Dr. Manolakas gave "some regard" to Garcia's

11   carpal tunnel syndrome and limited her to frequent handling and unlimited fingering.  AR

12   217, 785.  At the hearing in February 2007, Garcia testified that her hands were "pretty

13   good" and "okay," but if she used them "too much," her right hand would "stiffen up" and

14   she would get "trigger finger" on the right.  AR 358-59.  Based on the record, the ALJ

15   reasonably determined that with a history of bilateral carpal tunnel syndrome, right

16   greater than left, Garcia could perform frequent bilateral handling and fingering on the

17   left, and occasional fingering on the right.

18       The ALJ did not err in the RFC determination.

19       **D.    Credibility**

20       "To determine whether a claimant's testimony regarding subjective pain or

21   symptoms is credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v.*

22   *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  At step one, "the ALJ must determine

23   whether the claimant has presented objective medical evidence of an underlying

24   impairment 'which could reasonably be expected to produce the pain or other

25   symptoms alleged.'"  *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)

26   (en banc)).

27       "Second, if the claimant meets this first test, and there is no evidence of

28   malingering, the ALJ can reject the claimant's testimony about the severity of her

1   symptoms only by offering specific, clear and convincing reasons for doing so."

2   *Lingenfelter*, 504 F.3d at 1036 (citation and quotation marks omitted); *Burrell v. Colvin*,

3   775 F.3d 1133, 1137 (9th Cir. 2014).  The ALJ must specify what testimony is not

4   credible and what evidence undermines that testimony.  *Brown-Hunter v. Colvin*, 2015

5   U.S. App. LEXIS 13560, *3-*4 (9th Cir. Aug. 4, 2015).

6        In weighing credibility, the ALJ may consider factors including:  the nature,

7   location, onset, duration, frequency, radiation, and intensity of any pain; precipitating

8   and aggravating factors (e.g., movement, activity, environmental conditions); type,

9   dosage, effectiveness, and adverse side effects of any pain medication; treatment,

10   other than medication, for relief of pain; functional restrictions; the claimant's daily

11   activities; and "ordinary techniques of credibility evaluation."  *Bunnell*, 947 F.2d at 346

12   (citing SSR 88-13).  The ALJ may consider:  (a) inconsistencies or discrepancies in a

13   claimant's statements; (b) inconsistencies between a claimant's statements and

14   activities; (c) exaggerated complaints; and (d) an unexplained failure to seek treatment.

15   *Thomas*, 278 F.3d at 958-59.

16        The ALJ found that Garcia's medically determinable impairments could

17   reasonably be expected to cause the alleged symptoms, but that her statements

18   concerning the intensity, persistence and limiting effects of her symptoms were not

19   entirely credible.  AR 783.  The ALJ primarily relied on four reasons:  (1) the objective

20   evidence did not support Garcia's claims of disabling pain and limitations; (2) Garcia

21   failed to seek treatment commensurate with her allegedly disabling limitations; (3)

22   Garcia received conservative treatment; and (4) Garcia's activities of daily living were

23   not consistent with the alleged degree of pain and impairment.  AR 783-84.

24        1.  <u>Objective Evidence</u>

25        Although lack of objective medical evidence supporting the degree of limitation

26   "cannot form the sole basis for discounting pain testimony," it is a factor that an ALJ

27   may consider in assessing credibility.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir.

28   2005).  The ALJ found that the medical records did not support the alleged severity of

Garcia's symptoms.  In addition, the ALJ found no medical source statement supporting greater limitations than the RFC.  AR 783.  The ALJ noted that there were limited records for the period at issue, June 6, 2003 through December 31, 2004.  A diagnostic x-ray of the left knee taken in February 2003 revealed "minimal spur formation at the patellar joint surfaces," with no fracture or dislocation, and surrounding soft tissues within normal limits.  AR 155, 783.  In March 2003, as discussed above, a joint examination of the hands showed no clinical sign of rheumatoid arthritis, but there were 14 out of 18 tender points associated with fibromyalgia.  AR 182-83, 783.  In August 2003, an electrodiagnostic study indicated increased motor and sensory latencies consistent with bilateral carpal tunnel syndrome, right wrist greater than left, but in November 2003, Garcia indicated that her hands had gotten better since she stopped working in June 2003, and that she was told her arthritis in her knees was "not that severe."  AR 154, 165, 783.  She was advised to continue with anti-inflammatory medications and apply heat to sore spots.  AR 165, 783.  In August 2004, Dr. Meltzer conducted a physical examination that was essentially normal.  AR 225-28, 784.  He found no evidence of carpal tunnel syndrome clinically.  AR 228, 784.  He concluded Garcia had issues that were non-orthopedic in nature, and had no functional limitations. AR 228-29, 784.  Garcia underwent a psychiatric consultative examination with Dr. Smith in August 2004.  AR 232-37, 784.  Dr. Smith found that Garcia had normal concentration but did have some problems with memory.  AR 236, 784.  Dr. Smith concluded that her impairment was in the mild range.  AR 236, 784.  In September 2004, Dr. Manolakas assessed Garcia as capable of performing a range of light work. AR 214-21, 785.  Garcia's treating physician, Dr. Hantz, issued a letter in October 2004, stating that Garcia suffered from neuro-muscular disease, fibromyalgia, carpal tunnel syndrome and severe depression.  AR 265, 783.  The ALJ noted that Dr. Hantz failed to provide any specific functional limitations.  AR 265, 783.  Similarly, the ALJ noted Dr. Hantz failed to provide any functional limitations in his letters of October 2005 and March 2007, which were issued after the date last insured.  AR 275, 289, 786.  The ALJ

gave little weight to Dr. Hantz' statements because of their conclusory and general nature, the lack of Dr. Hantz' supporting medical findings, and the inconsistency with the medical records, which documented limited physical findings and no mental health treatment.  AR 786.

The ALJ's finding as to the objective medical record as a whole is supported by substantial evidence.

### 2. Failure to Seek Treatment Commensurate With Alleged Degree of Disabling Limitations

An ALJ may discount complaints about disabling pain when the claimant fails to seek treatment.  *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007); *see also Burch*, 400 F.3d at 681 (lack of consistent treatment may be considered in assessing credibility). The ALJ noted that Garcia had not sought the type of treatment one would expect of a disabled individual.  AR 784.  As discussed above, the record contains limited treatment records regarding Garcia's physical condition during June 6, 2003 through December 31, 2004, and no mental health treatment records.  Garcia testified she had not seen a psychiatrist or a psychologist since she stopped working in 2003.  AR 362.  She also testified she was a member of Kaiser and did not have any limitations on the number of times she could see a doctor.  AR 366-67.  The ALJ's finding is supported by substantial evidence.

### 3. Conservative Treatment

"[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citation omitted).  Given Garcia's allegations of severe and disabling impairments, the ALJ expected to see a greater level of intervention and more aggressive treatment options.  Instead, the record indicated a mild and conservative course of treatment with medication monitoring, routine diagnostic testing and follow-up care.  AR 784.  Garcia testified she had not received mental health treatment since she stopped working in 2003, and the record contains no mental health treatment records.

11

1    AR 362; *see also* AR 233.  The ALJ's finding is supported by substantial evidence.  AR

2    224, 272-74, 282, 285, 740-41.

3                    4.  <u>Activities of Daily Living</u>

4         An ALJ may consider a claimant's daily activities when weighing credibility.

5    *Bunnell*, 947 F.2d at 346.  The ALJ found that Garcia engaged in a "somewhat normal

6    level of daily activity and interaction during the period at issue."  AR 784.  He noted that

7    Garcia did daily house chores, cooked, cleaned, and spent time with her husband and

8    grand-daughter.  AR 112-13, 784.  In a Daily Activities Questionnaire dated June 26,

9    2004, Garcia stated that the household chores she could not do were vacuuming,

10   mopping, cleaning the walls, and changing the bed.  AR 113, 780.  Garcia stated that

11   she slept from mid-afternoon until dinner.  AR 112.  In a Third Party Function Report,

12   Garcia's husband stated that Garcia could do light household chores until she had to

13   rest; care for him and their grand-daughter; take care of her personal needs, except for

14   putting on her socks and shoes; and prepare simple meals.  AR 103-05.  Garcia told Dr.

15   Meltzer in August 2004 that she could take care of her personal needs.  AR 225.  She

16   told Dr. Smith in August 2004 that she could do household chores, cook, make snacks,

17   dress and bathe herself, go to the store, and drive a car.  AR 234.  On December 15,

18   2004, Garcia was noted to have a "very active 15 month old child" with her at a

19   fibromyalgia consult appointment.  AR 282.  Garcia argues that while she could perform

20   certain limited activities of daily living for brief periods of time, she could not sustain

21   those activities as would be required by full time competitive employment.  However,

22   the ALJ permissibly relied on evidence that Garcia could perform a variety of daily

23   activities as a factor undermining the alleged severity of her symptoms.

24        The ALJ's credibility finding is supported by substantial evidence.  "If the ALJ's

25   credibility finding is supported by substantial evidence in the record, we may not engage

26   in second-guessing."  *Thomas*, 278 F.3d at 959 (citing *Morgan v. Comm'r of Soc. Sec.

27   Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)).  The ALJ did not err.

28

### E.   Lay Witness Testimony

Garcia contends the ALJ did not properly consider her husband's third party lay statements.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). "When an ALJ discounts the testimony of lay witnesses, 'he [or she] must give reasons that are germane to each witness.'" *Valentine v. Comm'r*, 574 F.3d 685, 694 (9th Cir. 2009) (citation omitted).

The record contains three third party statements from Mr. Garcia:  an undated letter; a Third Party Function Report dated June 26, 2004; and a Third Party Function Report dated April 2, 2005.  AR 78, 103-11, 129-38.  In the undated letter, Mr. Garcia stated that Garcia used to be the "backbone" of the family by working eight to twelve hour days, six days a week at work, and being in charge of the household with extended family at home.  However, Garcia had slowed down, experienced pain and begun suffering from depression.  Medication and therapy does not help, and "[h]er disability has really changed her."  AR 78.

In the June 26, 2004 statement, Mr. Garcia stated that Garcia could do very light household chores until she had to rest, which was "a lot."  AR 103.  She helped take care of him and their grand-daughter.  AR 104.  She could prepare simple meals.  AR 105.  She did not go out alone "in case she bec[ame] ill."  AR 106.  She could drive and shop for groceries, and went shopping once a week for about an hour.  *Id.*  She read and watched television every day.  AR 107.  She could pay attention for very short periods.  AR 108.  She used a cane all the time, a brace and splint at night, and a walker in the morning.  AR 109.

In the April 2, 2005 statement, Mr. Garcia stated that on a good day, Garcia could dress in 15 to 20 minutes, but on a bad day she got dressed in over 30 minutes and needed help with buttons, snaps, zippers, socks, and shoes.  AR 130.  Garcia could do very light house work for about 20 to 30 minutes at a time, but on a bad day, she

1   usually rested all day and became very depressed.  AR 130, 132.  She raised their

2   grandchildren, and took care of animals and her husband.  She took care of paperwork

3   for her mother, aunt, in-laws, grandchildren, and husband.  AR 130.  She needed help

4   with "everything," including pumping gas, opening jars or sealed items, lifting, mopping,

5   sweeping, vacuuming, and changing beds.  AR 132.  She did not like to socialize with

6   others because she felt embarrassed by her condition.  AR 134, 136.  She did not have

7   any problems getting along with family, friends, neighbors, or others.  AR 134, 136.

8   She could stand one to two hours on a good day, walk up to an hour, and sit for 30

9   minutes at a time.  AR 135.  She used a cane and sometimes a walker in the morning,

10   braces for her hands at night, braces for her knees all the time and especially at night,

11   and a wheelchair for shopping.  AR 137.  Mr. Garcia concluded that Garcia's

12   "fibromyalgia has entered a new stage and is progressing very fast."  AR 138.

13        The ALJ discussed and summarized Mr. Garcia's three statements, to which he

14   gave "little weight."  AR 786-87.  The ALJ stated that regarding Mr. Garcia's conclusion

15   that Garcia's fibromyalgia had entered a new stage and was progressing very fast, Mr.

16   Garcia was not competent to make a diagnosis.  The ALJ also noted that Mr. Garcia

17   had a familial and financial interest in seeing that Garcia receive benefits.  The ALJ

18   concluded that the clinical or diagnostic medical evidence did not support Mr. Garcia's

19   statements.  AR 786.

20        Contrary to the ALJ's finding, lay witness testimony may be introduced to show

21   the severity of a claimant's impairment(s) and how it affects his or her ability to work.

22   *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) ("A lay person, Bruce's wife,

23   though not a vocational or medical expert, was not disqualified from rendering an

24   opinion as to how her husband's condition affects his ability to perform basic work

25   activities.").  The ALJ's reliance on bias also was not appropriate.  "[R]egardless of

26   whether they are interested parties, 'friends and family members in a position to

27   observe a claimant's symptoms and daily activities are competent to testify as to [his or]

28   her condition.'"  *Valentine*, 574 F.3d at 694 (citation omitted).  Evidence that a lay

witness "exaggerated a claimant's symptoms *in order* to get access to his disability benefits, as opposed to being an 'interested party' in the abstract, might suffice to reject that [person's] testimony." *Id.* (emphasis in original).  The ALJ made no such finding.

However, inconsistency with medical evidence is a germane reason to discount lay witness statements. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."); *see also* 20 C.F.R. § 404.1529(c)(3) (a factor to be considered in evaluating third-party statements is their consistency with the objective medical evidence and the record).  As discussed above, the ALJ thoroughly discussed the medical evidence, which was inconsistent with most of Mr. Garcia's lay witness statements.[4]

The ALJ's error is harmless in this case.  "Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se." *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012); *Valentine*, 574 F.3d at 694 (when ALJ provided clear and convincing reasons for rejecting claimant's testimony and lay witness' testimony was similar, "it follows that the ALJ also gave germane reasons for rejecting the [lay witness'] testimony.").  Here, Mr. Garcia did not identify material limitations that were not already generally described by Garcia.  As discussed above, the ALJ articulated sufficient reasons supported by substantial evidence for discounting Garcia's credibility.

---

[4]  The ALJ gave "some limited weight" to Mr. Garcia's observations that Garcia was capable of cooking and performing household chores because they were factual observations and not conclusory statements.  AR 786-87.

### F.   <u>Step Five</u>

Garcia contends the ALJ erred at step five because the combination of her impairments precluded her from performing any work.

At step five, the Commissioner bears the burden of demonstrating there is other work in significant numbers in the national economy the claimant can do.  *Lounsbury*, 468 F.3d at 1114.  If the Commissioner satisfies this burden, the claimant is not disabled and not entitled to disability benefits.  If the Commissioner cannot meet this burden, the claimant is disabled and entitled to disability benefits.  *Id.*  "There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can do:  (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."  *Id.*

The VE testified that a person with Garcia's RFC could perform the jobs of booth cashier, order desk caller, and counter clerk.  AR 942-43.  Based on the testimony of the VE, the ALJ determined at step five that there were other jobs that existed in the significant numbers in the national economy that Garcia could have performed, such as booth cashier, order desk caller, and counter clerk.  AR 788.

Garcia argues that the occupations of booth cashier and order desk caller require upper extremity usage which would exceed her RFC.  The Dictionary of Occupational Titles ("DOT")[5] indicates that the booth cashier and order desk caller jobs require frequent fingering, but the DOT does not specify whether both hands or simply one hand may be used.  DOT No. 211.462-010 (booth cashier); DOT No. 209.677-014 (order desk caller).  The Commissioner argues that jobs requiring fingering can be performed with one arm.  *See Slye v. Astrue*, 2012 WL 425266, at *4-5 (C.D. Cal. Feb. 9, 2012).  Because the DOT does not require frequent bilateral fingering, the booth

---

[5]  The DOT raises a rebuttable presumption as to job classification.  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).

16

1  cashier and order desk caller jobs do not require fingering that exceeds Garcia's RFC.

2  *See Gutierrez v. Astrue*, 2012 WL 234366, at *2 (C.D. Cal. Jan. 24, 2012) ("[G]enerally

3  speaking, the requirement [in the DOT] that an employee frequently use his hands to

4  perform a job does not mean that he has to be able to use both hands.") (citing *Carey v.*

5  *Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)); *McConnell v. Astrue,* 2010 WL 1946728, at *7

6  (C.D. Cal. May 10, 2010) (DOT does not necessarily require fingering by both hands).

7      Garcia argues that the occupation of counter clerk requires more than simple,

8  routine and repetitive tasks.  The DOT indicates that the counter clerk job requires

9  Reasoning Level 2.  DOT No. 249.366-010.  Reasoning Level 2 requires one to "[a]pply

10  commonsense understanding to carry out detailed but uninvolved written or oral

11  instructions," and "[d]eal with problems involving a few concrete variables in or from

12  standardized situations."  *Id.*

13      The Ninth Circuit recently held that Reasoning Level 2 is consistent with a

14  limitation to simple repetitive work.  *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015);

15  *see also Rounds v. Comm'r*, 795 F.3d 1177, 1183 n.6 (9th Cir. 2015) ("Unpublished

16  decisions of panels of this Court and opinions from some of our sister circuits have

17  concluded that an RFC limitation to "simple" or "repetitive" tasks is consistent with Level

18  Two reasoning.").  Therefore, the counter clerk job, which requires Reasoning Level 2,

19  is consistent with Garcia's RFC limitation to simple, routine and repetitive tasks.  To the

20  extent Garcia argues the counter clerk job requires her to deal with people beyond the

21  giving and receiving of instructions, her argument fails.  According to the DOT

22  description, the counter clerk interacts with people to receive film, return processed film,

23  sell photo supplies, and answer questions about prices and services.  DOT No.

24  249.366-010.  Thus, the counter clerk job is consistent with Garcia's RFC.  The ALJ's

25  step five determination is supported by substantial evidence.  The ALJ did not err.

26

27

28

IV.

**ORDER**

IT IS HEREBY ORDERED that the decision of the Commissioner is affirmed.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment herein on all parties or their counsel.

DATED: September 22, 2015

_____
ALICIA G. ROSENBERG
United States Magistrate Judge